Filed 3/15/21  P. v. Watts CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DANIEL WATTS,<br><br>    Defendant and Appellant. | D076687<br><br><br>(Super. Ct. No. SCD280957) |

APPEAL from a judgment of the Superior Court of San Diego County, Amalia L. Meza, Judge.  Affirmed.

Russell Sheridan Babcock, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Minh U. Le, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Daniel Watts challenges his convictions for making a criminal threat and providing false information to a peace officer on two grounds:  (1) that references to his purported gang affiliation were improperly

admitted and prejudiced his trial; and (2) that there was insufficient evidence to sustain the criminal threats conviction. Our review of both issues gives requisite deference to the trial court and jury. Because we find no prejudicial error by the court or lack of substantial evidence, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

When San Diego Police Officer Loui Sandoval saw a department wide be-on-the-lookout (BOLO) flyer about Daniel Watts, he paid particular attention because Watts was known to frequent an area within Sandoval's regular rounds. The BOLO flyer included some specific details that Sandoval kept in mind: (1) Watts was a Southeast Locos gang member, and (2) he had an outstanding felony probation violation warrant based on a conviction for being a felon in possession of a firearm. Resolving to take a route each day that would maximize his chances of seeing Watts, Sandoval kept his eyes open—and found just who he was looking for one morning in March. Sandoval and Officer Erik Elizondo attempted to arrest Watts after they saw him get into a Mitsubishi he was known to drive. But from the first point of contact until the end of the incident, there were problems.

It started when Watts gave the officers a false name. Sandoval then asked him to step out of the car, opening the door as Watts went for his phone. Sandoval grabbed the phone and pulled Watts from the car. Elizondo, who was approaching from behind, tried to handcuff Watts—who repeatedly asked why he was being arrested. Receiving no response, Watts resisted by tensing his arms and grabbing the car door so Elizondo was unable to secure the cuffs. After a few moments of rising tension where the officers tried to assert control and Watts continued to resist, he managed to shove the officers away. Watts ran, with both officers pursuing him, but did not get far before Elizondo tackled him. According to Sandoval, Elizondo had

2

his arms wrapped around Watts's legs, but the two were still struggling when he caught up. Sandoval joined the fray, straddling Watts and hitting him with "elbow strikes" which brought the fight to an end. When Officer Michael Boxell arrived to help, the officers were finally able to get Watts into handcuffs.

What else occurred during the scuffle is the subject of some controversy. The officers said Watts grabbed Sandoval's baton and tried to unholster Elizondo's gun. But bystander Christopher Vela disagreed, claiming he observed a subdued Watts who was unable to move, let alone grab for weapons. Under ordinary circumstances, the body worn cameras (BWC) issued to the officers might resolve this dispute, but both cameras were knocked off when Watts shoved the first two officers at the car.

After Watts was subdued, Sandoval recovered his camera and put it back on, but Elizondo did not. As a result, there are two BWC videos of what occurred next—one captured by Sandoval's camera and one by Boxell's. Unlike the scuffle between the officers and Watts, the verbal exchange was recorded and is subject to little debate.

As he was being handcuffed, Watts lay on the pavement, yelling at Vela to be his witness and insisting the police had "fucked [him] up for no reason." He then became increasingly agitated, barking "fuck the cops" and "fucking pigs." It became decidedly more personal when he aimed his verbal ire at the officers next to him, saying he would, "Fuck you guys up[,] watch. That's a fucking threat homie, watch." He then said something about his handcuffs, and told Sandoval, "[I'm] [trying] to see you again dog, I'm trying to get out. That's a fucking threat homie," followed by "[you] heard me" when Sandoval asked what he said. After that, Watts declared he was done talking to them.

Although Watts was arrested on a felony warrant, that case is not at issue here. We are concerned only with Watts's confrontation with officers during his arrest, and the resulting charges. The San Diego County District Attorney's office brought six counts against him: count 1, making a criminal threat against Sandoval (Pen. Code, § 422)[1]; counts 2 and 3, resisting an executive officer (one charge for resisting Sandoval and one for resisting Elizondo) (§ 69); count 4, removing and taking an officer's weapon while resisting arrest (for removing Sandoval's baton) (§ 148, subd. (b)); count 5, attempting to remove and take an officer's firearm while resisting arrest (for attempting to take Elizondo's gun) (§§ 148, subd. (c), 664); and count 6, giving false information to a peace officer (for providing a false name) (§ 148.9, subd. (a)).

Watts took his case to trial. The People offered testimony from the involved officers and the BWC footage. Christopher Vela testified for Watts.

After the close of evidence, the jury returned guilty verdicts as to counts 1 and 6, but acquitted Watts of counts 4 and 5, and hung on counts 2 and 3. In light of this result, Watts pleaded guilty to count 2 in a bargain that dismissed count 3, with his sentence to run concurrent with his time on counts 1 and 6.

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

## DISCUSSION

1.    *Gang Evidence*

Before the trial began, the defense sought to exclude any reference to Watts's gang ties, his probation status, or any previous firearms convictions—requests the prosecution opposed. The prosecutor explained that the officers' *belief* that Watts was a gang member who might be armed, and their knowledge that he was wanted for violating his probation, were relevant to proving her case. More specifically, the People were responsible for demonstrating Watts was not unlawfully detained or arrested in proving counts 2 through 6. And CALCRIM No. 2670, which was given in this case, instructs juries to "consider. . . all the circumstances known by the officer when he or she detained the person" to determine if a detention is lawful.

The trial court considered its obligations under Evidence Code section 352, and ultimately decided that "in light of what CALCRIM [No.] 2670 requires, that evidence of what the officers knew about the defendant's background with regard to guns and gang membership is more probative than prejudicial." The court admitted the evidence only to establish the mindset of the officers. The People further sought to introduce the BOLO flyer that alerted Sandoval to Watts's wanted status in order to bolster the officers' credibility. The court again weighed the evidence, and eventually allowed an amended version of the flyer to be introduced—one that scrubbed the specific gang name from the document and changed the flyer's declaration that Watts was in a gang to a softer statement that he was believed to be in a gang. The defense accepted that some mention of Watts's alleged gang affiliation and his probation status would come into evidence, but consistently maintained its objection to the admission of the flyer.

5

During Sandoval's testimony, the prosecutor stepped outside the boundaries of the court's in limine ruling by eliciting testimony that Sandoval's belief in Watts's gang involvement also factored into why he interpreted Watts's words as a threat. Defense counsel objected, which led to a brief sidebar conference and, later, a limiting instruction given by the court. The instruction told the jury to confine its consideration of Watts' purported background to determining whether the officers acted lawfully and whether Sandoval interpreted Watts's words as a threat.

At the conclusion of Sandoval's testimony, defense counsel moved for a mistrial because using the officer's belief about Watts's gang membership to prove the criminal threats charge was not approved during motions in limine, where the defense sought to exclude *all* gang-related evidence. The court denied the mistrial motion, reasoning that since the jury was not hearing anything new and it provided a limiting instruction afterward, the defendant was not prejudiced. The following day, the court clarified that it now understood the full import of the issue defense counsel had raised and agreed the testimony elicited from Sandoval transgressed the motion in limine ruling. But it found a mistrial unwarranted because the gang evidence was relevant to the criminal threats count and it found no prejudice from the simple repetition of something the jury already knew. For their part, the People conceded they failed to consider the importance of the gang evidence in proving the criminal threats count, and inadvertently omitted it from their response to the defense's motion in limine.

Another mistake occurred during Sandoval's testimony; the BOLO flyer was left on display for about 45 minutes, clearly longer than intended. But this issue was swiftly addressed when defense counsel brought it to the court's attention and the flyer was immediately taken down.

6

Watts now argues that the gang-related evidence admitted was highly inflammatory and violated his due process rights, taking particular issue with the BOLO flyer, the length of time it was displayed, the reference to Watts's apparent gang moniker of "Boxer," and the repetition of the officers' belief that he was gang-involved. He emphasizes that since his charges did not involve gang activities or allegations, the evidence lacked probative value. He further urges us to analyze prejudice under the stringent standard articulated in *Chapman v. California* (1967) 386 U.S. 18, 24 for errors of constitutional magnitude.

Watts is correct that gang evidence can inflame jurors and, even if relevant, must be handled carefully. (*People v. Williams* (1997) 16 Cal.4th 153, 193; *People v. Carter* (2003) 30 Cal.4th 1166, 1194.) In this regard, Evidence Code section 352 permits courts to exclude relevant evidence if its probative value is substantially outweighed by the probability of prejudice. This is an exercise of discretion we review under "the deferential abuse of discretion standard" (*People v. Kipp* (2001) 26 Cal.4th 1100, 1121), and we will not disturb the trial court's decision unless it was arbitrary, capricious or patently absurd and resulted in a miscarriage of justice. (*People v. Jones* (1998) 17 Cal.4th 279, 304.) No different standard applies to the admission of gang-related evidence. (*People v. Avitia* (2005) 127 Cal.App.4th 185, 193.) Evidence that is prejudicial " ' "uniquely tends to evoke an emotional bias against defendant" without regard to its relevance on material issues.' " (*Kipp,* at p. 1121.) With gang evidence, the particular danger posed is that the jury will assume the defendant is a criminal and convict on that basis. (*People v. Brown* (2003) 31 Cal.4th 518, 547; *People v. Williams* (2009) 170 Cal.App.4th 587, 612.)

In making his case for prejudicial error, Watts relies on *People v. Bojorquez* (2002) 104 Cal.App.4th 335. The defendant there was similarly charged with a crime—robbery—that was not gang related, but testimony regarding gangs was admitted anyway. However, the defendant opened that door himself by testifying he was previously affiliated with the gang "BST" and left that life in June 2000. (*Id.* at p. 340.) A detective who qualified as a gang expert then took the stand, purportedly for impeachment purposes. He testified the defendant and another witness both told him they were BST members several times in June and July 2000. (*Id.* at p. 342.) In reviewing this part of the expert's testimony, the court of appeal found no error since the inconsistent statements were relevant to evaluating the witness' truthfulness and any prejudice did not clearly outweigh the probative value. (*Id.* at p. 343.) But the rest of the detective's broad ranging testimony was problematic. He explained certain gang tendencies, demographics, activities, and crimes, mentioning more than once that gangs pursued robberies to make money before saying BST was involved in criminal activities. In finding prejudicial error, it was this part of the expert testimony that the appellate court disapproved—noting that all the background information on gangs had "minimal, if not nonexistent" probative value, but tended to paint the defendant as a likely robber. (*Id.* at pp. 343–344.)

Here, there is no similarly expansive evidence that would tempt the jury to impermissibly conclude the defendant was guilty due to his gang association. At all times, the evidence introduced was framed in light of the officers' *belief* that Watts was gang affiliated, and the bearing that had on their states of mind and the circumstances known to them. This was a necessary part of the People's case and was probative to explain why the officers approached Watts on high alert, were immediately concerned when

8

he gave them a false name, and pursued his arrest with some aggression—all part of the total circumstances the jury had to consider in evaluating whether Watts was lawfully detained and arrested. Watts's gang background (or at least Sandoval's belief in it) was independently probative of the criminal threats count, tending to bolster the People's case that Sandoval reasonably took Watts's words as a threat and was in sustained fear as a result.[2] Given all these factors, we cannot say the risk of undue prejudice substantially outweighed the probative value. Moreover, the court took pains to mitigate any prejudice by confining all statements about Watts's gang affiliation to a "belief" held by officers; it was never submitted to the jury as an objective fact. The court also provided a limiting instruction so the jury would restrict their consideration of Watts's purported background to its effect on the officers' reasonable beliefs and understandings.

*People v. Killebrew* (2002) 103 Cal.App.4th 644, which Watts also invokes, does not change our analysis. The defendant in that case was convicted of conspiracy to possess a handgun, and the facts, as well as the gang testimony offered, are entirely distinct from this case. *Killebrew* involved a complicated cat-and-mouse game between patrol officers and gang members in several different cars who apparently ditched a gun near a taco stand to avoid being caught with it. (*Id*. at pp. 648–649.) The defendant was standing nearby, and the prosecution tied him to the cars and the gun by relying on expert testimony that went so far as to opine, "when one gang member in a car possesses a gun, every other gang member in the car knows of the gun and will constructively possess the gun." (*Id*. at p. 652.) This part of the expert's testimony, which offered opinions on the "the subjective

---

[2]    We discuss this count and its elements in greater detail in the next section.

9

*knowledge and intent* of each occupant in each vehicle," was the only evidence offered by the People to support the charged crime. (*Id*. at p. 658.) Because it was improper and clearly the source of the defendant's erroneous conviction, he obtained a reversal on appeal. (*Id*. at pp. 659, 661.)

In contrast, and as discussed above, the gang-related evidence in this case was both relevant and appropriately limited to avoid the risk of prejudice. The only possible exception might be the BOLO flyer, which contained information that Sandoval could have relayed verbally without a visual aid.[3] As amended, the flyer displayed a mugshot style picture of the defendant, under a banner that read "Felony Warrant Suspect," next to listed information such as his name, address, height, and apparent alias of "Boxer." Below the picture and biographical data, there was a paragraph in small text explaining Watts had a felony warrant for a probation violation, that he was on probation for being a felon in possession of a firearm, and he was "believed to be a gang member." It was thus largely duplicative of information the jury already had.

But even assuming admission of the flyer was an error, we find no indication of prejudice. The record demonstrates the jury was conscientious and focused on its proper task. It convicted Watts solely of the crimes it observed him commit on camera—making a criminal threat and giving false information to a peace officer. And his acquittals on counts 4 and 5 show that the jurors extended the benefit of the doubt to Watts and considered the conflicting testimony presented by the officers and Christopher Vela. Their failure to reach a verdict on the remaining counts, and their accompanying

---

[3] Watts makes much of the fact that the flyer was displayed for approximately 45 minutes. We find this less significant since the court had the flyer taken down as soon as defense counsel brought the issue to the court's attention.

10

note, is also telling. Juror one wrote, "We are unable to reach a verdict on counts 2 [and] 3. The definition of 'unlawfully used force' from [CALCRIM No.] 2652 is a sticking point. We do not all agree on what the term means." Both the note and the results of the trial show this jury was dedicated to the task at hand and spent its time discussing relevant legal definitions. They were not swept up in a prejudicial sway of emotion engendered by gang evidence.

On this record, there is simply no likelihood[4] the outcome would have been different if the jury never saw the BOLO flyer, did not know Watts's alias was "Boxer," or heard fewer references to Watts's alleged gang association. We find no prejudicial error. For that same reason, the trial court was correct when it denied the motion for mistrial.

2. *Criminal Threats*

Watt's second challenge is to the sufficiency of the evidence supporting his conviction for making a criminal threat. He asserts that three of the elements are unsupported. For the reasons discussed below, we disagree, finding enough evidence for a reasonable jury to conclude he was guilty beyond a reasonable doubt.

In considering this challenge, we review the record for substantial evidence to support the conviction, viewing " ' "the entire record in the light most favorable to the prosecution to determine whether it contains evidence

---

4    We do not agree with Watts that any alleged error should be reviewed as a constitutional transgression; due process is offended by the court's evidentiary rulings "[o]nly if there are no permissible inferences the jury may draw from the evidence." (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229.) That is not the case here, where there were logical and permissible inferences regarding the mindset of the officers. Nonetheless, we would affirm under any prejudice standard.

that is reasonable, credible, and of solid value, from which a rational trier of fact could find [the elements of the crime] beyond a reasonable doubt." ' " (*In re George T.* (2004) 33 Cal.4th 620, 630–631.) It is important to note that we do not substitute our own evaluation of the evidence; the only " 'relevant question is whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Gaut* (2002) 95 Cal.App.4th 1425, 1430 (*Gaut*); quoting *Jackson v. Virginia* (1979) 443 U.S. 307, 318–319.)

As to the elements of making a criminal threat, our Supreme Court has delineated them as follows: "In order to prove a violation of section 422, the prosecution must establish all of the following: (1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat . . . was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety . . . ,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances." (*People v. Toledo* (2001) 26 Cal.4th 221, 227–228; § 422.) Furthermore, a "judicial gloss has been placed upon the statutory elements of this offense" such that "the communication and the surrounding circumstances are to be considered together" to determine if a criminal threat was made. (*In re Ryan D.* (2002) 100 Cal.App.4th 854, 860 (*Ryan D.*).)

12

Because surrounding circumstances are important, we recount them in further detail here.  Sandoval and Elizondo caught sight of Watts while on duty, recognizing him from the BOLO flyer that identified Watts as a gang member with a warrant out for violating his parole.  They knew he had previous arrests for carrying firearms.  They waited for an opportune time to approach him.  When they confronted him in his car, he gave them a false name.  They told him to step out of the car and tried to arrest him, but Watts tensed his arms and grabbed the door, making it impossible for them to safely handcuff him.  Then he shoved them and ran.  They chased him, tackled him, and eventually subdued him.

As other officers arrived to help, Watts declared he was "done," allowing himself to be handcuffed.  But he then become verbally antagonistic.  In a display caught entirely on the BWCs, he said repeatedly that the police had "fucked me up for no reason," and then said "fuck the cops" and "fucking pigs homes."  To these more general statements he added some directed at the officers on the scene:  "Fuck you guys up, watch.  That's a fucking threat homie, watch."  In a section that is hard to make out due to background noise, he seems to ask when his handcuffs will be taken off, followed by his words to Sandoval specifically, where he says "[I'm] trying to see you again dog, I'm trying to get out.  That's a fucking threat homie." When Sandoval asks what he said, Watts replies "[you] heard me" before he declares, "I'm done talking to you guys."

Against this backdrop, Watts argues his conviction for criminal threats is unsupported by substantial evidence, suggesting his words were too ambiguous to portend great bodily injury, that they lacked immediacy and specificity, and that Sandoval did not experience sustained fear.  We take

13

each argument in turn and explain why a reasonable jury could have found each element was satisfied beyond a reasonable doubt.

As to the first element, Watts claims his statement that he would "fuck you guys up" is ambiguous. He believes the phrase spans a broad range of actions, including relatively benign ones like shoving someone or keying their car. While the term "fuck" is perhaps the most versatile vulgarity in the English language, its fluidity does not obscure its meaning in this context. As a Kansas appellate court has already explained, the term communicates something specific when combined with the other words Watts used:

> "What, then, does the phrase 'to fuck [a person] up' commonly mean or convey? The verb 'fuck' is both vulgar and protean in meaning. As an unadorned intransitive verb, the word is an especially crude synonym for having sexual relations. Combined with 'up,' the intransitive verb is a vulgar expression for having made a mistake—'I really fucked up; I forgot to pay the fine, so there's a warrant out for me.' But as a transitive verb, especially with a person as the direct object, the phrase has a quite different and well-recognized hostile meaning, as in: 'I am going to fuck you up.' [Citations.] In short, the phrase commonly conveys a threat of harm typically involving physical injury." (*City of Wichita v. McMillan* (Kan.Ct.App., June 3, 2016) 2016 Kan.App. Unpub. Lexis 428, \*5.)

A brief survey of other decisions that have considered the meaning of "fuck [someone] up" show courts reaching the same conclusion—that the phrase is commonly understood to communicate a threat of serious bodily harm. (See *S.L.L. v. MacDonald* (Or.Ct.App. 2014) 267 Or.App. 628, 633 ["respondent's threat to "fuck up" petitioner was a credible threat of imminent serious physical harm"]; *DiCarlo v. McCarthy* (Or.Ct.App. 2006) 208 Or.App. 184, 186, 188 [respondent's statements to the petitioner of "I'm going to fuck you up, I'm going to fuck your old man up, and I'm going to fuck

14

your truck" were "overtly threatening, and they reasonably put petitioner in fear of immediate and serious personal violence from respondent."].)

Moreover, given our standard of review, we need not conclude the phrase *must* be interpreted as a threat of great bodily injury or worse; it is enough that a reasonable jury could have concluded as much. The jury here was entitled to consider the actual words Watts used, and since the plain meaning of Watts's phrase commonly conveys a threat of physical harm, we have little trouble finding sufficient evidence to support this element of the crime. (See *In re George T.* (2004) 33 Cal.4th 620, 636 ["the words actually used" are critical in determining whether there was a real threat].)[5]

Watts frames the third element as the most problematic, arguing that because he was handcuffed and there was no indication he would be freed soon, the threat lacked immediacy and specificity. But in focusing on his constraints in the moment, Watts misses the emphasis of this element— which places primary importance on the threat's effect on the victim. "In light of the analysis and reasoning . . . [in] other cases, which place important emphasis on the effect the threatening words have on the victim, we understand the word 'immediate' to mean that degree of seriousness and imminence which is understood by the victim to be attached to the future prospect of the threat being carried out . . . ." (*People v. Melhado* (1998) 60 Cal.App.4th 1529, 1538.) The use of "so" as a qualifier in section 422 underscores this point, because it indicates the threat need only be

---

[5]    In focusing on plain meaning, we do not mean to indicate words should always be taken literally. Another Watts in a different era was guilty only of fiery political speech when he insinuated he would shoot then President Lyndon B. Johnson if he was forced to fight in the Vietnam War. (*Watts v. U.S.* (1969) 394 U.S. 705, 708.) But here, there is no suggestion that the attendant circumstances fundamentally altered the meaning of Watts's words.

15

immediate *enough* to convey gravity and immediacy to the victim.  (*Ryan D., supra,* 100 Cal.App.4th at p. 861; see also *People v. Bolin* (1998) 18 Cal.4th 297, 340.)  As to specificity, little more than a threat of grave injury is required; the "time or precise manner of execution" need not be expressed.  (*People v. Butler* (2000) 85 Cal.App.4th 745, 752.)  Furthermore, the four factors are not a list of sub-elements within the statute.  Rather, they are "simply the factors to be considered in determining whether a threat, considered together with its surrounding circumstances, conveys those impressions to the victim."  (*People v. Smith* (2009) 178 Cal.App.4th 475, 480 (*Smith*).)

Watts thus focuses on the wrong person—the defendant—when it is the impression given to the victim that matters.  The defendant's physical inability to act on the threat could, of course, limit the effect of the words if that inability was apparent to the victim.  But there is no requirement that a criminal threat be something the offender can immediately carry out.  (*People v. Lopez* (1999) 74 Cal.App.4th 675, 679.)  This is because "[s]ection 422 targets those who try to instill fear in others."  (*People v. Mosley* (2007) 155 Cal.App.4th 313, 323.)  The threat itself is the crime, and its commission does not rise or fall on the threatener's capacity to follow through.  With this in mind, we look to other cases where the defendant was physically unable to carry out the threat when it was made.

*Gaut, supra,* 95 Cal.App.4th 1425 presents a helpful analog.  There, the defendant threatened his former girlfriend over the phone while he was in jail.  He argued on appeal that "because he was incarcerated and unable to carry out the threats there was no immediate prospect of execution."  (*Id.* at p. 1431.)  In rejecting this rationale, the court considered his history of domestic violence and his promise to make good on his threat when he was

16

released—which could have been within three days of the phone call. (*Id.* at p. 1432.) In all, the context conveyed to the victim an immediate prospect of execution of the threat. (*Ibid.*)

*Smith, supra,* 178 Cal.App.4th 475 also upheld a criminal threats conviction that was physically impossible in the moment the threat was communicated. The case involved a defendant who had severely abused the victim, his long term partner. Although the defendant was in Texas with no means to travel and the victim was in California, the court of appeal upheld the defendant's conviction based on his history of violence and the victim's reasonable "fear [the] defendant would follow through on the threats he made" even though he was in another state. (*Id.* at p. 481.)

*People v. Franz* (2001) 88 Cal.App.4th 1426 presents yet another instance. The defendant made a threat while a police officer was present and was subsequently arrested. He argued there was no immediacy since he was taken away from the victims and did not see them again until his trial. (*Id.* at p. 1449.) The court was unimpressed with this assertion, pointing out that the victims did not know when they might see the defendant next, and that the "immediacy factor was present in the surrounding circumstances that defendant was in a rage." (*Ibid.*)

*People v. Wilson* (2010) 186 Cal.App.4th 789 (*Wilson*), our final example, involved an inmate who threatened to kill a correctional officer when he was released on parole in ten months. (*Id.* at p. 798.) The court reasoned that this threat was specific and immediate, notwithstanding the long time period contemplated, because the defendant "effectively made an appointment to kill [the correctional officer] at his earliest possible opportunity—he would perform the act the instant he was set free." (*Id.* at p. 814.)

17

The through line in each of these cases is not the length of time it might take for the defendant to act on the threat, but rather the effect on the listener—which can be particularly potent when the defendant has a history of violence known to the victim.  In arguing to the contrary, Watts relies on *In re Ricky T.* (2001) 87 Cal.App.4th 1132 (*Ricky T.*).  In that case, a student told a teacher, " 'I'm going to get you,' " or, perhaps " 'kick [your] ass.' "  (*Id*. at p. 1135.)  But it was not a criminal threat because there were no attendant circumstances that animated the student's words and made them serious.  As the court pointed out, there was no history of physical confrontation between the parties, and the threat lacked gravity.  (*Id*. at pp. 1137–1138.)  Here, in contrast, the specter of violence loomed—both because the two men had just been in a physical confrontation, and because Sandoval believed Watts to be gang affiliated and often armed.

Even with that difference, this case might still be more akin to *Ricky T., supra,* 87 Cal.App.4th 1132, if Watts had stopped after saying he would "fuck you guys up."  Unlike some of the cases discussed, there was no long history of violence between Watts and Sandoval, and one outburst might not have conveyed the gravity of purpose necessary for a criminal threat.  But Watts went further in ways that mirror the more severe conduct of the defendants in the other cases.  He informed Sandoval he would be trying to see him when he got out, and then, lest Sandoval miss his point, emphasized that this was a threat.  Such behavior is reminiscent of the defendant in *Wilson*, *supra*, 186 Cal.App.4th 789 and given the surrounding context, provides enough for a reasonable jury to conclude that Watts threatened Sandoval with sufficient immediacy and specificity to sustain a conviction.

Watts mounts a final challenge to the evidence supporting a conclusion that Sandoval experienced *sustained* fear.  Section 422 does not define this

element, but courts have held that sustained means any "period of time that extends beyond what is momentary, fleeting, or transitory." (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156 (*Allen*); see also *People v. Roles* (2020) 44 Cal.App.5th 87, 942, *People v. Fierro* (2010) 180 Cal.App.4th 1342, 1349, and *People v. Solis* (2001) 90 Cal.App.4th 1002, 1016, all adopting the definition of "sustained" formulated in *Allen*.) Here, the evidence supporting this element comes from Sandoval's testimony. He interpreted Watts's words as a threat "that he was going to hurt me" and said Watts seemed "sincere" and "serious." He also took into account Watts's arrest history and his belief that Watts was a gang member.

When Sandoval was asked by the prosecutor why he did not leave the scene if he felt afraid of Watts, Sandoval responded he still had to be there for his job—that he was obligated to stay and give a statement about what happened. He further testified that he sometimes experiences fear as a police officer, and that Watts's threats had been on his mind "for some time," cropping up on the eve of his testimony and generally staying with him "from that day, still, till [*sic*] now." Sandoval said he believed Watts was capable of carrying out the threat, and he kept that in mind and took precautions as a result.

Although Sandoval did not use certain words like "fear" and "sustained" to describe the threat's effect on him, he indicated rather clearly that he thought about the threat regularly, considered Watts capable of acting on it, and took extra precautions as a result. In short, he described a mental burden that he mulled over frequently and its effect on his actions. That he stopped short of testifying, in as many words, that he was afraid on a daily basis does not mean there was insufficient evidence to support such a finding. The jury was entitled to draw rational inferences from the evidence,

19

even without an express statement from Sandoval that he was frightened. (See, e.g., *People v. Renteria* (1964) 61 Cal.2d 497, 499 [victim's fear could be demonstrated through other evidence even when the victim testified that he was not afraid of the defendant].)  Here, it was reasonable to infer Sandoval felt unsafe and fearful from the time of the threat up until the trial. Furthermore, Sandoval's testimony that he thought Watts was a gang member was a particularly probative indication of his fear, because "[t]he victim's knowledge of defendant's prior conduct is relevant in establishing that the victim was in a state of sustained fear." (*Allen, supra*, 33 Cal.App.4th at p. 1156.)  Based on his testimony, a reasonable jury could find he had sustained fear.

3.     *Pitchess Review*

Watts's final request for our review concerns his search for relevant information from the personnel files of Officers Sandoval and Elizondo, a discovery process commonly known as a *Pitchess* motion.  (*Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*), later superseded by the statutory scheme that codified it; see *Long Beach Police Officers Assn. v. City of Long Beach* (2014) 59 Cal.4th 59, 68; Pen. Code, §§ 832.5, 832.7, 832.8; Evid. Code, §§ 1043–1047.)  Specifically, Watts requested information bearing on the officers' dishonesty, unreasonable use of force, or other misconduct.  As is required when the defendant shows good cause in a *Pitchess* motion, the trial court conducted an in camera review of certain personnel files to determine if discoverable information existed.  (*People v. Mooc* (2001) 26 Cal.4th 1216, 1226 (*Mooc*).)  This procedure protects both the defendant's due process rights and the privacy interests of the officers involved.  (*Id*. at p. 1220.)

20

Watts asks us to independently review the sealed transcript from the trial court's in camera hearing along with the personnel files of officers Elizondo and Sandoval that were presented to the court at that time. We evaluate the trial court's decision as to what, if any, portions of police personnel files are discoverable for an abuse of discretion. (*Mooc, supra,* 26 Cal.4th at p. 1228.) But we need not always review the actual personnel files considered. In many cases, it is enough for the appellate court to review the transcript alone when the trial court describes for the record the documents it examined. (*Id.* at p. 1229; *People v. Myles* (2012) 53 Cal.4th 1181, 1209.) Because that is the case here, we need not obtain the actual records to provide meaningful review.

Our review suggests that Watts's appellate counsel may have been misled by incorrect minutes included in the record. These minutes state that the court did not deem any material from the hearing discoverable. That was not the case, but is an understandable mistake given the unfortunate inaccuracy in the record available to the defendant on appeal. This court is privy to more information from the sealed transcript,[6] which shows the court identified one incident pertinent to the defense and ordered the information turned over.[7] Aside from clearing up this misunderstanding, we are further satisfied from our independent review that the court committed no abuse of discretion. The judge considered the material, noting each file as she

[6]    When the reporter's transcript and the clerk's transcript conflict, the reporter's transcript generally prevails. (*In re Moss* (1985) 175 Cal.App.3d 913, 928.)

[7]    Although this court was not provided a copy of the transcript immediately following the in camera hearing, it is also clear from later discussions preceding the trial that the defense was given the relevant information pursuant to its successful *Pitchess* motion.

reviewed it, and specified why it was not relevant to the *Pitchess* motion—with the exception already mentioned, which she ordered disclosed.

## DISPOSITION

The judgment is affirmed.

DATO, J.

WE CONCUR:


HUFFMAN, Acting P. J.


O'ROURKE, J.